## Keen's Estate.

Argued January 28, 1930.　Before Moschzisker, C. J., Frazer, Walling, Simpson, Sadler and Schaffer, JJ.

*A. A. Vosburg,* with him *Chester A. Garrett* and *A. F. Vosburg,* for appellant, cited: Egbert v. Egbert, 78 Pa. 326; Titlow v. Titlow, 54 Pa. 216; Brickner v. Lightner, 40 Pa. 199; Logan v. McGinnis, 12 Pa. 27; Irish v. Smith, 8 S. & R. 573; McTaggart v. Thompson, 14 Pa. 149; Shaver v. McCarthy, 110 Pa. 339; Reichenbach v. Ruddach, 127 Pa. 564; Pidcock v. Potter, 68 Pa. 342; Yardley v. Cuthbertson, 108 Pa. 195; McCormick v. McCormick, 194 Pa. 107; Blume v. Hartman, 115 Pa.

32; Miller's Est., 179 Pa. 645; Scattergood v. Kirk, 195 Pa. 195.

*A. G. Rutherford,* with him *A. E. Swoyer,* for appellee, cited: Shotwell's Est., 1 Pa. Dist. R. 257; Rice's Est., 3 Pa. Dist. R. 262; Lawrence's Est., 286 Pa. 58; Masseth v. Masseth, 213 Pa. 434.

OPINION BY MR. JUSTICE WALLING, March 17, 1930:

Miss Anna E. Keen, the decedent, died at her home in Honesdale, on December 2, 1928. Soon thereafter, what purported to be her last will was duly probated and entered of record in the register's office. Therefrom, Alice J. Cole and others, relatives of the deceased, appealed to the orphans' court and prayed for an issue to determine the questions of testamentary capacity and undue influence. A responsive answer was filed and the testimony was taken before a commissioner. The orphans' court, upon a very careful review of the facts and law applicable thereto, refused to award an issue and contestants have appealed.

We are satisfied by an exhaustive review of the record, that it presents no cause for reversal. The testatrix, eighty years of age, was a cultured maiden lady who had spent her life in Honesdale and had taught music for many years. She had two maiden sisters and the three lived in the family home. The sisters predeceased her by a few weeks. They had lived frugally and were not considered people of any considerable means. Testatrix, being the last of her immediate family, left no surviving relatives nearer than cousins. Her closest male relative, the only one with whom she kept in touch, was Fred S. Keene, the prothonotary of Wayne County, who also resided in Honesdale, and she had been on terms of friendship with him and his wife for about twelve years. During the last few years he had been in the habit of occasionally doing errands for her, including some small matters of business, and on November 17,

1928, she gave him a power of attorney to act generally for her. Four or five days after constituting Keene her attorney in fact, he wrote the will here in controversy, following, in many instances, an unsigned will, hereinafter mentioned, making some changes and adding some bequests. The will so written was signed by Anna E. Keen and attested by Julia Helferich and Alice J. Cole, as subscribing witnesses. At its probate, the subscribing witnesses went before the register and made the usual affidavits as to the due execution of the instrument and the testamentary capacity of the testatrix. When the matter came before the orphans' court they were called to testify and, while admitting they signed as witnesses to the signature of Miss Keen, testified that it was not read or explained or its contents exposed to view and that they understood it was merely a paper authorizing the cremation of her remains; in fact, it contains, inter alia, such a provision. They also expressed opinions adverse to Miss Keen's testamentary capacity, but stated no facts upon which such opinions were based and, of course, being subscribing witnesses, were not required to. The force of this testimony is lost, being in sharp conflict with the affidavits of the same witnesses made before the register. Even "the attestation of a signature to a will, or other document, is a direct assertion by the witness that the maker is competent to understand and execute it": Snyder's Est., 279 Pa. 63. It is also worthy of note that said Julia Helferich has presented a claim for occasional services performed for the decedent during a period of thirty years. Caroline Kalish, a witness for contestants expressed a like opinion as to Miss Keen's lack of testamentary capacity, without stating any foundation of facts to give it weight. The above is practically all the testimony submitted by contestants on the question of testamentary capacity. It is agreed that the testatrix had been a hospital patient in the fall of 1928, when she underwent a surgical operation and returned to her

home late in October. Thereafter she was physically weak but able to be up more or less. One of the sisters died November 12th, and during that night testatrix dictated a will to a woman who acted as scrivener, making numerous small bequests. This was witnessed but not signed by the maker. The proponents' evidence is that Miss Keen handed the unsigned will of November 12th to her cousin, Fred S. Keene, on November 21st, instructed him as to the changes she desired made which included a bequest of $200 to the cemetery association, of $50 to Beebe Warwick, a neighbor, and the home to Keene's wife and making Keene and Nellie Hulsizer, who was employed in a greenhouse near by and for years was a frequent visitor of testatrix, residuary legatees, share and share alike. The evidence for proponents showed beyond question that Anna E. Keen, the testatrix, had ever been a woman of strong mind and firm character; that, while physically weak, after returning from the hospital, those characteristics continued until the delirium of her last sickness. This will was executed by her on November 22d, ten days before her death, and three days before she was stricken with pneumonia. The evidence for the proponents is not only that she dictated the will but sent for those she desired to witness it and in their presence declared it was her will. She signed it in a firm natural hand, identical with her normal handwriting. The signature being normal tends to disprove the contention of mental and physical weakness: Spence's Est., 258 Pa. 542, 547. True, those present at the execution of the will who so testify were legatees thereunder and as such interested in sustaining the will; but they were competent and apparently candid witnesses.

There is a presumption of testamentary capacity to which proponents here added strong affirmative evidence, including that of Dr. Nielson, a physician of large experience in mental diseases, who was called, November 19th, to treat Miss Keen for severe bronchial cold and

called again the next day. He came again November 25th, she having received no medical treatment during the five days, which includes the date of the will and, after the 25th, called every day until her death December 2d. On or soon after November 25th, bronchial pneumonia developed, which was the cause of her death. The doctor without hesitation expresses the opinion that she had testamentary capacity and says he observed nothing wrong with her mind except as affected by the pneumonia during the last days. The doctor says he remembers the case well because his attention was called to it within a month after her death. The same opinions were expressed by half a dozen disinterested lay witnesses, ladies who had known Miss Keen intimately for many years, some of whom saw her and conversed with her daily, before and after the date of the will and they agree that her mind was perfectly normal at that time and until affected by the pneumonia. Oscar Howell, a neighbor, who was called by Miss Keen to her home on November 14th, and assisted her in finding some of the belongings of a deceased sister, tells of the talk he had with her and expresses the opinion that she was then competent to transact business. From all the evidence, it is clear that Miss Keen's mind was perfectly good until affected by the pneumonia, which did not have its inception until three days after the will was executed. Caroline Kalish, the witness for contestants, to whose testimony we have referred, is uncertain as to the time of her observations, but when she speaks of Miss Keen's mind as being a blank and she being near death can refer only to her condition during the last stages of the pneumonia. No court or chancellor could say there was here such a disputed question of fact as to warrant the granting of an issue on the question of testamentary capacity or that would support a verdict against the will on that ground.

On the other alleged ground: "In order to constitute undue influence sufficient to void a will, there must be

imprisonment of the body or mind,......fraud, or threats, or misrepresentations, or circumvention, or inordinate flattery, or physical or moral coercion, to such a degree as to prejudice the mind of the testator, to destroy his free agency and to operate as a present restraint upon him in the making of the will": Phillips's Est., 244 Pa. 35, 43; Wolfe's Est., 284 Pa. 169; Koons's Est., 293 Pa. 467, 471. "To sustain allegations of undue influence, contestants must show that testator's mind was under its control at the time and in the very act of making his will": Tetlow's Est., 269 Pa. 486, 487. That a son who acted as the attorney and attended to business for testatrix is favored in her will does not cast upon him the burden of disproving undue influence: Hook's Est., 207 Pa. 203. In this case, Chief Justice MITCHELL, speaking for the court (page 205) says: "This leaves the only real question in the case that of undue influence. To set aside a will on this ground where the testator is in full possession of his faculties and his testamentary capacity admitted or established, the evidence must be clear and strong. Mere opinions or suspicions or belief not founded on facts testified to will not be sufficient: Englert v. Englert, 198 Pa. 326." As to undue influence, aside from the fact that Fred S. Keene held Miss Keen's power of attorney five days old, there is no evidence in the record to even cause a suspicion of it. They had never occupied the same house, and while their relations were very friendly they were not confidential. He had been kind to her, was her nearest male relative and it was natural that he should be remembered in her will. There was no proof as to the value of the estate or of what its residue will amount to. We have no knowledge of the value of the homestead, but the devise thereof to Keene's wife, so it might remain in the family, was natural under the circumstances. As to that and the residuary legacy to Nellie Hulsizer we concur in the opinion of the orphans' court, that: "The bequest to Jennie S. Keene, wife of Fred S.

Keene, was well deserved. She was the one that apparently looked after the sisters for years when it appeared they were poor and somewhat needy and none of the other relatives came near nor did anything for them except Mrs. Cole during the last days of the testatrix's illness. It is noted that no bequest appeared in the memorandum to Mrs. Cole and she received $200 under the will.

"Nellie Hulsizer was a close friend of the family, visited the three sisters daily and on the way back and forth to work called to see what they might need. She spent each Sunday afternoon with them during the winter months. She assisted in their birthday celebrations, visited the testatrix at the hospital and was one of the testatrix's best friends and knew nothing of the bequest in the will until after the decedent's death.

"While it is true that the bequest of Nellie Hulsizer was raised from $50, mentioned in the memorandum, to one-half of the residuary estate, yet there is not a scintilla of evidence that either Jennie S. Keene or Nellie Hulsizer had anything to do with the drafting of the will or the dictating of its contents."

Assuming, but not deciding, that because of his being her attorney in fact, a confidential relation existed, yet, unless her mind was enfeebled by bodily ailment or otherwise, the burden was not cast upon him of disproving undue influence. The burden shifts only where there is evidence of weakened intellect: Phillips's Est., supra, page 44; Llewellyn's Est., 296 Pa. 74, 82. In the latter case, testator, although very sick, had a perfectly sound mind. Bodily weakness alone is not sufficient to shift the burden of proof. Miss Keen was physically weak because of her age and recent surgical operation, but the reliable evidence is that her mind was entirely normal. Keene being a relative, friend and agent, was the party to whom Miss Keen would naturally look to assist in drawing her will, especially as he held an office in the courthouse and might be familiar with such work.

And, even though a legatee, that fact alone did not raise a presumption against him. See Ahlberg et al. v. Gurley et al., 284 Pa. 491.

Moreover, if the burden was on contestants to establish undue influence, their case failed, for the evidence does not even raise a suspicion against the will. About the only so-called proof was the statement of Caroline Kalish, that on November 12th, Miss Keen told her: "Well," she said, "You know, Miss Kalish, that Mrs. Fred Keene and Nellie Hulsizer found out awhile ago I had money, and since then they've been very attentive; before then, it was only coming in whenever they felt like it." "Now," she said, "I feel I should make a will because I want my money to go where I want it to go." She said: "I wish they would keep away." She said: "Mrs. Helferich is the one I want to have it and Allie," meaning Mrs. Cole, "is coming over." She also testified the wife of Fred Keene told her on December 3d, in effect, that her husband had persuaded Miss Anna to make another will because he did not consider the one witnessed by legatees legal. These statements do not harmonize with actual facts. All the other evidence is to the effect that the testatrix was very fond of both Fred and his wife. For example, Mrs. Esther Spencer, a witness for proponents, testified: "Well, after Louisa died, she [Miss Anna] said to me: "I sat up pretty near half the night fixing kind of a will; I thought I was going to die and Mrs. Mumford wrote and she called Mr. Howell in, but I don't think it's legal and I'm going to get Mr. Keene, who has been a very dear friend of mine and never charged me nothing, and I'm very, very fond of Mr. Keene and Nellie Hulsizer; she's been just like a daughter to me." Futhermore, there is no other evidence in the case that Miss Keen desired Mrs. Helferich to have her property and in the draft of the will of November 12th, she was given $50, while in the will here involved she was given $200. Again, the first will was not thought illegal because witnessed by legatees, in

fact the will written by Keen was so witnessed, but because Miss Keen did not sign it. Even the alleged statement did not show that testatrix was under the influence of Keene, but rather the contrary. Caroline Kalish was a star witness for the contestants. Her testimony was to the effect that Miss Keen was at the point of death and her mind a blank when she executed the will; but later admitted she was uncertain as to when that condition existed. She made other rash statements and we are not greatly impressed with her testimony. Moreover, declarations of testator tending to show undue influence and mental weakness must be supported by other evidence: Robinson v. Robinson, 203 Pa. 400. The will was a natural one and there is not a word of evidence that it was procured by any undue influence or improper means, aside from the alleged statement of the testatrix to Caroline Kalish, which statement, unless accompanied by other proof, is of no moment. See Page on Wills (ed. of 1901), page 502. Aside therefrom there is no evidence tending even slightly to establish undue influence.

Assuming that the burden was on proponents to show the absence of undue influence, it was fairly met. There is the above quoted testimony of Mrs. Spencer, also the positive evidence of Mr. and Mrs. Keene and of Miss Hulsizer that they never in any manner spoke to Miss Keen about her will or attempted to influence her in the disposition of her property. Keene said he drew the will at her request as she directed and that it was read and approved by her.

As the orphans' court judge did not see or hear the witnesses, we have an equal opportunity to judge of the facts, but we agree with his conclusions and with his final statement, that "She [Anna E. Keen] had a full and complete knowledge of the extent of her estate. As there is no evidence sufficient to satisfy the conscience of the chancellor that there was a lack of testamentary capacity or undue influence there is no such disputed

440

fact in controversy in which an issue should be awarded. The will probated was the intelligent act of the testatrix." The evidence here considered as a whole, that for as well as against the will, would not support a verdict for contestants; hence, an issue should not be granted. See Leisey's Est., 280 Pa. 533; Keller v. Lawson, 261 Pa. 489.

The record suggests a question of practice on appeal from the register's order probating a will. In such case, it is sufficient for the proponents in the first instance to offer the register's record of probate, including the will; thereupon, the burden of proof shifts to the contestants. See 1 Rhone Orphans' Court Practice (3d ed.), page 737; 28 R. C. L. 145. "Until a prima facie case against the will has been made out by the contestant, they [the proponents] may rest upon the proof before the register, whose decree admitting the will to probate stands until duly reversed": Whitaker's Est., 10 W. N. C. 139, opinion by Judge PENROSE. This question is not of vital importance here as the proponents offered proof in the orphans' court of the execution of the will.

The decree is affirmed and the appeal dismissed at the cost of appellants.